# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **J & J SPORTS PRODUCTIONS, INC.**, |
| Plaintiff, |
| v. |
| **TESFIT KIFLU**, |
| Defendant. |

Case No. 18-cv-225 (CRC)

## MEMORANDUM OPINION

On May 2, 2015, Floyd "Money" Mayweather, Jr. and Manny "Pac-Man" Pacquiao squared off in a boxing match billed as "The Fight of the Century." Unfortunately for the tens of millions of viewers around the world, it proved to be anything but. Among the likely disappointed were approximately 120 patrons at the Cloud Restaurant & Lounge in Washington, D.C., which aired the fight despite having no right to do so. Plaintiff J & J Sports Productions, Inc. ("J & J") had exclusive rights to contract with bars, restaurants, and other establishments who sought to broadcast the match. J & J filed suit against the Cloud Lounge's owner, Defendant Tesfit Kiflu, seeking damages under the Federal Communications Act ("FCA") for its lost revenue as well as enhanced damages for Mr. Kiflu's ostensibly willful violation of the law.

Floyd Mayweather won a judges' decision in his fight by using what commentators called a highly defensive strategy. Here, Kiflu has employed no defense at all. Despite receiving service of process indicating that he should get ready to rumble, Kiflu declined to enter the ring. He failed to answer the suit against him and now J & J seeks a default judgment—the law's version of a technical knockout. The Court will issue a split decision. It will award J & J the amount Kiflu would have had to pay to broadcast the fight legally, as well as some attorneys'

fees, but it will not award enhanced damages because J & J has not proffered sufficient evidence to justify them.

I.  **Background**

The FCA prohibits unauthorized interception, receipt, publication, or use of certain types of communications, including the type of encrypted satellite signals at issue in this case. See 47 U.S.C. § 605(a).[1] The Act creates a private right of action by "[a]ny person aggrieved by any violation" of the relevant prohibition. Id. § 605(e)(3)(A). It authorizes a court to award between $1,000 and $10,000 in statutory damages for each violation, "as the court considers just." Id. § 605(e)(3)(C)(i)(II). Further, it permits a court "in its discretion" to award up to $100,000 in enhanced damages "[i]n any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain[.]" Id. § 605(e)(3)(C)(ii). The FCA also allows a court to award attorneys' fees and costs to a prevailing plaintiff. Id. § 605(e)(3)(B)(iii).

J & J obtained exclusive rights to distribute broadcasts of the Mayweather-Pacquaio bout, allowing it to charge bars, restaurants, and other establishments that sought to show the fight. See Mot. Default J. Ex. 3 ("J & J Contract"), ECF No. 11-4, at 3–9. The cost for showing the fight depended on the establishment's capacity. Id. at 1 ("Rate Card"). J & J disseminated the program to establishments with which it had contracted via closed circuit television and

---

[1] J & J invokes both 47 U.S.C. § 553 and § 605. Section 605 deals with theft of radio communication while § 553 deals with communication thefts from a cable network. "Courts have found in cases with almost identical facts that the alleged conduct violated both statutes." J & J Sports Prods., Inc. v. Quattrocche, No. WMN-09-CV-3420, 2010 WL 2302353, at *1 (D. Md. June 7, 2010) (collecting cases). J & J concedes that relief is available under either § 605 or § 553, but not under both simultaneously. See Mot. Default J. at 5–6. While J & J invokes both provisions, it focuses on, and asks the Court to grant it relief pursuant to, § 605. Id. at 6. Accordingly, the Court's analysis centers on that provision.

encrypted satellites signals. The Cloud Lounge did not contract with J & J to show the fight. But, according to an investigator's affidavit, it showed the program to its patrons anyway. See Compl. Ex. A ("Martin Affidavit"), ECF No. 1-1. Per the affidavit, the lounge was at capacity—approximately 120 people—such that it refused to allow more patrons to enter. Id. at 2–3.

## II. Legal Standards

Default judgment requires a one-two punch. See, e.g., Amaya v Logo Enters., LLC, 251 F. Supp. 3d 196, 199 (D.D.C. 2017). First, a plaintiff must request that the Clerk of the Court enter a default against an opposing party who has "failed to plead or otherwise defend[.]" Fed. R. Civ. P. 55(a). An entry of default "establishes the defaulting party's liability for the well-pleaded allegations of the complaint." Boland v. Elite Terrazzo Flooring, Inc., 763 F. Supp. 2d 64, 67 (D.D.C. 2011). Second, the plaintiff must petition the court for a default judgment against the defaulting party. Fed. R. Civ. P. 55(b)(2). This process ensures that an absentee defendant cannot escape liability simply by refusing to participate in judicial proceedings. See Amaya, 251 F. Supp. 3d at 199.

Once an entry of default establishes liability, a court has substantial discretion in determining the appropriate award for the plaintiff. It must do so through an independent assessment of the alleged damages. A court may hold a hearing or can base its evaluation on "detailed affidavits or documentary evidence" submitted by the plaintiff in support of its claims. Boland v. Providence Constr. Corp., 304 F.R.D. 31, 36 (D.D.C. 2014) (quoting Fanning v. Permanent Sol. Indus, Inc., 257 F.R.D. 4, 7 (D.D.C. 2009)). The court is not required to hold a

3

hearing "as long as it ensures that there is a basis for the damages specified in the default judgment." Elite Terrazzo Flooring, Inc., 763 F. Supp. 2d at 67.

### III. Analysis

The Court will first assess Kiflu's liability and then evaluate the appropriate damages.

#### A. Liability

J & J has submitted an affidavit that puts forth sufficient facts to demonstrate that the Cloud Lounge broadcast the fight. See Martin Affidavit at 2–4. J & J had exclusive rights to distribute the fight, see J & J Contract, and Cloud did not contract with J & J, see Compl. ¶¶ 12–13. There is thus no doubt that there was a violation of the FCA.

Determining whether Kiflu is personally liable for that violation presents a slightly thornier question. It appears that no court in this circuit has ever held a business's proprietor liable for § 605 violations by that business. See Report & Recommendation as appended to J & J Sports Prods., Inc. v. Micherie, LLC, No. 17-CV-1150 (KBJ), 2018 WL 4629301, at *4–6 (D.D.C. Sept. 27, 2018). Elsewhere, however, "a large body of cases—and, indeed, what appears to be the great weight of authority—suggests that an individual corporate officer may be held liable for a corporation's infringing acts under the FCA[.]" Joe Hand Promotions, Inc. v. Wright, 963 F. Supp. 2d 26, 28 (D.D.C. 2013) (collecting cases). To establish such liability, courts have held, a plaintiff must show "that the individual had a 'right and ability to supervise' the violations, as well as an obvious and direct financial interest in the misconduct." Id. (quoting Circuito Cerrado, Inc. v. Pizzeria y Pupuseria Santa Rosita, Inc., 804 F. Supp. 2d 108, 112–13 (E.D.N.Y. 2011)). Courts often refer to this inquiry as the "benefit and control test," which asks whether an individual both controlled the violation and benefited from it. See id. While some courts have questioned this test, see id. (collecting cases), and no court in this circuit

4

appears to have decided the matter one way or the other, this Court chooses to apply it here. The Court sees little reason to prevent a plaintiff harmed by corporate violations of § 605 from seeking recovery from an individual who directs that malfeasance for his or her own personal benefit. To be sure, due to Kiflu's failure to defend the case, the Court does not have the assistance of full briefing on the matter. Kiflu remains free to appear in the case and move to set aside this default judgment. Similarly, future litigants who *do* appear will be free to explain why other courts in this district should not embrace this standard.

Here, then, the question remains whether J & J's submissions suffice to show that Kiflu himself should be held liable under the "benefit and control test." The Court concludes that they do. The Cloud Lounge is a small business and Kiflu is its owner and one of two governors listed in documents filed with the District of Columbia's Department of Consumer and Regulatory Affairs. See Mot. Default J. Ex. 6, ECF No. 11-7. Moreover, Kiflu appeared before D.C.'s Alcoholic Beverage Regulation Administration Board and was described personally as "trading as" Cloud Restaurant and Lounge. See Mot. Default J. Ex. 5, ECF No. 11-6, at 11–24. He signed as the lounge's "Managing Member" a voluntary agreement with D.C.'s Advisory Neighborhood Commission 1B. Id. at 5–10. The documentation J & J has submitted makes clear that Kiflu owns and runs the Cloud Lounge, a relatively small establishment. The Court can therefore draw a very reasonable inference that he both controlled and benefitted from the violation.

To be sure, some courts have demanded that plaintiffs seeking to hold individuals personally liable for corporate FCA violations demonstrate that the individuals were present during the malfeasance. See, e.g., J & J Sports Prods., Inc. v. MayrealII, LLC, 849 F. Supp. 2d 586, 592 (D. Md. 2012). Here, the Court thinks that is too much to ask, given Kiflu's failure to

5

appear and the attendant burdens on J & J's ability to make its case. The Court finds it highly unlikely, given the nature of the small business and the facts J & J has presented, that someone at the lounge would have intercepted the satellite signal and broadcast the fight absent Kiflu's knowledge and say-so. Again, Kiflu's failure to appear deprives the Court of the opportunity to find facts or credit arguments to the contrary. As it stands now, however, the Court is satisfied that in this particular case, J & J's showing suffices to demonstrate that Kiflu had control over, and benefitted from, the FCA violation and should thus be personally liable.

B. Damages

Having concluded that Kiflu is personally liable, the Court will now evaluate the extent of his liability. Section 605 of the FCA permits the Court to award up to $10,000 in statutory damages for each violation, 47 U.S.C. § 605(e)(3)(C)(i)(II), as well as up to $100,000 if it finds that "the violation was committed willfully and for the purposes of direct or indirect commercial advantage or private commercial gain," id. § 605(e)(3)(C)(ii). J & J contends that the appropriate sum here is $36,000: $6,000 for the underlying violation and an additional $30,000 in enhanced damages to reflect the willful nature of Kiflu's violation. See Mot. Default J. at 7–10.

The Court concludes that $6,000 in statutory damages alone is appropriate. J & J has provided its "Rate Card," showing that it charged $6,000 to establishments with capacities between 101 and 200 people. See Rate Card at 1. It has also submitted an affidavit indicating that the Cloud Lounge has a capacity of approximately 120 people. See Martin Affidavit at 3. Thus, as J & J notes, the $6,000 figure reflects the fee that Kiflu would have paid to broadcast the fight.

On the other hand, the Court finds that J & J's submissions do not suffice to show that $30,000 in enhanced damages is warranted. While there is no doubt that the violation was "willful[] and for the purposes of . . . private commercial gain," 47 U.S.C. § 605(e)(3)(C)(ii), J & J's own briefing indicates that courts look to other factors to determine whether enhanced damages are appropriate, see Mot. Default J. at 7. These factors include: repeated violations, substantial unlawful monetary gain, advertising the broadcast, and charging an admission fee or premiums for food and drink. See, e.g., Quattrocche, 2010 WL 2302353, at *2. Here, J & J has not put forth any evidence that Kiflu engaged in repeat violations, advertised the broadcast, or charged an admission fee or premium. Moreover, absent evidence of a fee or premium pricing, it is hard to imagine that Kiflu's monetary gain was so substantial as to warrant $30,000 in enhanced damages. J & J itself acknowledges that it would "be unconventional to award the Plaintiff the quantum of damages it [seeks] . . . from a defendant in a default setting[.]" Mot. Default J. at 10. The Court declines to take that unconventional step where ordinary statutory damages appropriately compensate J & J and deter future violations by Kiflu.

C. Attorneys' Fees and Costs

J & J also seeks attorneys' fees and costs for this action. Section 605 provides that the Court "shall direct the recovery of full costs, including reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 605(e)(3)(B)(iii). In this instance, J & J requests $3,372.50 in fees and costs. See Mot. Default J. Ex. 4, ECF No. 11-5 ("Gormly Declaration"). To this end, its attorney has submitted a declaration indicating that this figure appropriately reflects both the work he has already done and the work he will need to do to execute judgment in this case. Id. He bases his assessment of future work on extensive experience handling similar matters. Id.

In this case, however, J & J's attorney made critical errors that compel the Court to reduce his fee. He failed to serve two defendants who were initially named in the complaint alongside Kiflu, including the corporate entity that owns the lounge, see generally Compl., but nevertheless moved for default judgment against all three defendants, see First Mot. Default J., ECF No. 8. This error led the Court to hold a hearing and deny J & J's initial motion for default judgment, see May 31, 2018 Minute Entry, which prompted J & J to dismiss its case against the two other defendants, see Notice of Dismissal, ECF No. 9, and move again for default judgment, this time against Kiflu alone. These hours cannot fall under the umbrella of "reasonable attorneys' fees": the need to properly serve defendants is a basic step in any litigation and J & J's attorney's failure to do so does not land at Kiflu's feet. The Court will not order him to compensate J & J for time spent correcting that error. As such, the Court will reduce the requested fees by one-third and award $2,248.33 in fees and costs.

## IV. Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff's Motion for Default Judgment. A separate Order shall accompany this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: December 12, 2018